# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 23, 2021         Decided August 5, 2022

No. 18-3045

UNITED STATES OF AMERICA,
APPELLEE

v.

CHARLES MORGAN, JR.,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cr-00196-1)

———

*Lisa Wright*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender. *Tony Axam Jr.* and *Michelle M. Peterson*, Assistant Federal Public Defenders, entered appearances.

*Daniel J. Lenerz*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Elizabeth Trosman* and *Elizabeth H. Danello*, Assistant U.S. Attorneys.

Before: SRINIVASAN, *Chief Judge*, KATSAS, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

2

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*: Appellant Charles Morgan, Jr. was indicted for transportation of a minor with intent to engage in criminal sexual activity, attempted production of child pornography, and commission of a felony involving a minor by a person required to register as a sex offender. After a bifurcated jury and bench trial, Morgan was convicted on all counts.

On appeal, Morgan brings three challenges to his convictions. First, he contends that the district court abused its discretion by admitting the government's expert testimony concerning the approximate locations of Morgan's and the transported minor's cell phones on the night of their meeting. Second, Morgan argues that the government should have been required to prove not just that he transported a minor to engage in sexual activity, but that he knew she was underage. Third, Morgan challenges the constitutionality of the Act that required him to register as a sex offender. Because we are unpersuaded by Morgan's arguments, we affirm.

I.

A.

In November 2016, a grand jury charged Charles Morgan, Jr. with transportation of a minor with intent that the minor engage in sexual activity for which any person could be criminally charged, in violation of 18 U.S.C. § 2423(a); attempted production of child pornography, in violation of 18 U.S.C. § 2251(a), (e); and two counts of commission of a felony involving a minor by a person required to register as a sex offender, in violation of 18 U.S.C. § 2260A.

Pursuant to the parties' stipulation, the district court held a bifurcated trial. The court first held a jury trial on the transportation and child pornography charges. The government put forth the following facts in the jury trial. The defense did not put on a case.

In May 2016, J.T. was 15 years old and lived with her mother in an apartment in Southeast Washington, D.C. On May 22, a Sunday, J.T. was at her grandmother's house in Southwest D.C., where she planned to stay overnight. But after getting into an argument with her cousin that evening and sensing her grandmother's resulting frustration, J.T. decided to sneak out of her grandmother's house and return home.

J.T. took the bus part of the way home and walked the remainder of the way. When J.T. arrived at her apartment building in Southeast D.C., she could not get into her apartment—she did not have keys, the lights in the apartment were off, and she was unable to reach her sister. J.T. decided to meet a friend with whom she had been texting and then to spend the night at the home of her friend's sister. After learning that the bus would not arrive at the nearest stop for another 20 to 25 minutes, J.T. decided to walk along the bus route toward Pennsylvania Avenue, where she was to meet her friend. She eventually reached Randle Circle—still in Southeast D.C.— where she stopped to wait for the bus because she was tired and her phone battery had died.

While J.T. waited for the bus at Randle Circle, a car pulled over and idled for a few minutes. The driver—Charles Morgan, Jr., then 55 years old—rolled down his window and asked J.T. if she wanted a ride. J.T. did not respond and turned away. Morgan then told her that he "wouldn't do things like that," showed her "a government I.D.," and gave her a business card. Apr. 27, 2018 Trial Tr. 129:11–30:22, App. 982–83. J.T.

decided to get in Morgan's car because "he seemed old" and "like he wouldn't do nothing like that." *Id.* at 131:18–19, App. 984. Morgan then asked for her name, her age, and where she lived. J.T. told him that she was 14 but did not answer the other questions.

Instead of driving her home, Morgan drove to another part of Southeast D.C. and stopped the car near the Fort Davis Recreation Center. J.T. recognized the location because her mother had worked there in the summer. Morgan then fondled J.T. in the car and forced her to perform fellatio on him.

After J.T. sat back up, Morgan began driving again. J.T. saw them pass a "Welcome to D.C." sign on the driver's side of the car. Morgan drove into Maryland, parked at a house, and led J.T. into the basement apartment. Morgan told J.T. to get on the bed, where he proceeded to sodomize her. After he stopped sodomizing J.T., Morgan eventually led J.T. back to the car.

Morgan drove J.T. to her requested location in Southeast D.C, around the corner from her mother's apartment, and gave her his number. J.T. went inside the apartment and told her mother what had happened. They reported the incident to the police shortly thereafter.

Later that week, a police detective obtained J.T.'s consent to assume J.T.'s identity and start communicating with Morgan. After the detective (pretending to be J.T.) and Morgan exchanged several text messages, Morgan asked J.T. to send him a picture of her genitalia. In response, the detective set up a recorded call between Morgan and J.T. On the call, Morgan reiterated his request for the picture. After Morgan briefly hung up, they got back on the phone and J.T. said she was just 14 years old. Morgan reacted with apparent surprise

and hung up again.  Morgan tried calling J.T. several times later that night but did not reach her.  The detective and Morgan exchanged sporadic text messages for the next several days until Morgan stopped communicating.

B.

1.

To demonstrate a violation of 18 U.S.C. § 2423(a) (the transportation charge), the government needed to prove that Morgan had transported J.T. from D.C. to Maryland on the night she rode in his car, May 22.  To that end, the government sought to call FBI Special Agent Kevin Horan as an expert witness to opine about the locations of J.T.'s and Morgan's cell phones during that night.  Horan's testimony would be based on the results of a "drive test," and it was meant to support J.T.'s account that Morgan had transported her from D.C. to Maryland.

A drive test is a method of identifying the coverage range of a cell tower.  Drive tests are used primarily "by wireless telephone companies and radio frequency engineers to determine . . . the health of the telephone company's wireless network."  Larry Daniel, *Cell Phone Location Evidence for Legal Professionals: Understanding Cell Phone Location Evidence from the Warrant to the Courtroom* 69 (2017).  Law enforcement personnel also conduct drive tests, typically to determine the approximate coverage area of a particular tower to which a cell phone of interest connected during a relevant time period.  *See* Aug. 22, 2017 *Daubert* Hearing Tr. 11:8–17:20, App. 467–73; *see also* Daniel, *supra*, at 69–71; *United States v. Nelson*, 533 F. Supp. 3d 779, 786 (N.D. Cal. 2021).  By determining a tower's coverage area, law enforcement can

narrow down the cell phone's location when it connected to that tower.

After the government indicated its intention to call Horan as a witness at trial to give testimony about drive tests he had conducted in connection with this case, Morgan moved to exclude the testimony. The district court then held a multi-day *Daubert* hearing on the admissibility of Horan's testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Horan stated at the hearing that he has been a member of the FBI's cellular analysis survey team (CAST) since its inception in 2007. He annually conducts an average of twenty to thirty drive tests. Before Morgan's trial, Horan had testified as an expert seventy-six times, and in the last several years, almost all of his cases involved drive tests. The district court accepted Horan as an expert in "historical cell site analysis, which includes the drive test." Aug. 22, 2017 *Daubert* Hearing Tr. 10:22-23, App. 466.

Horan told the court that he prepares for a drive test by analyzing call-detail records to understand which cell phone towers a cell phone communicated with during the relevant time period. He then creates a "target area" containing both the "target tower" and "the other towers that are surrounding it." *Id.* at 23:19–24:3, App. 479–80. Using that area, Horan generates a planned route that he will drive with the testing equipment. He conducts the drive test by driving along the planned route with a device—the Gladiator Autonomous Receiver (GAR)—manufactured by a company named Gladiator. The GAR collects radio frequencies and GPS data and stores them in a computer system. Horan typically drives until he becomes satisfied that he has "gone through all the different parts of [the] target area, . . . gone by the [relevant] addresses, [and] . . . gone around the tower enough times on certain streets." *Id.* at 28:14–16, App. 484. The drive tests

typically "take[] more than one day" to complete. *Id.* at 27:25, App. 483.

After completing the driving portion of a drive test, Horan processes the collected data through Gladiator's proprietary software program, Enterprise Sensor Processing and Analytics (ESPA). The software generates maps depicting the approximate coverage area of the towers of interest. Another agent then independently reviews the collected data and the ESPA analysis to check whether there were any errors. When asked how the software processes the data, Horan explained he had not been granted permission to access and examine the underlying software code and thus was unsure precisely how it functioned.

For this case, Horan had conducted a two-day drive test on November 28 and December 1, 2016. He intended to evaluate the coverage area of the cell phone towers used by J.T.'s T-Mobile phone and Morgan's Sprint phone from approximately 11:00 p.m. to 1:00 a.m. on May 22–23. Horan examined their phone records to identify the towers to which their phones had connected during that two-hour window, developed his route, and conducted the drive test to determine where the phones could have been located when they connected to particular towers. After completing the test, Horan used the ESPA software to generate a number of maps showing the results of his testing.

At the *Daubert* hearing, Horan presented those maps and other slides to the district court. The slides showed his intended driving route, his actual driving route, and his findings with respect to the coverage of a particular cell tower, which he used as an example to demonstrate the type of results his testing produced.

Morgan called his own expert witness to testify about drive testing. The defense witness agreed with Horan that, in theory, a drive test "can give you a better defined area than" other forms of cell-site location analysis, "depending on the process and how it's done." Oct. 11, 2017 *Daubert* Hearing Tr. 13:22–14:5, App. 653–54. The defense witness also opined that Horan's drive test did not cover a large enough area to determine with precision where a phone could no longer connect to a particular tower. The expert conceded, however, that towers in cities may have smaller coverage areas. That is because, in dense urban areas, providers use "down tilt"—i.e., they direct a tower's signal "into the ground so that it ends at [a] point"—to prevent interference from other towers. *Id.* at 66:7–19, App. 706.

The district court denied Morgan's motion to exclude Horan's testimony. *United States v. Morgan*, 292 F. Supp. 3d 475 (D.D.C. 2018). With regard to Morgan's reliability challenge under Federal Rule of Evidence 702, the court held that the drive-test methodology at issue exhibited sufficient indicia of reliability to allow Horan to testify before the jury. *Id.* at 484–85. The court also held that Horan's testimony would not be unduly misleading in violation of Federal Rule of Evidence 403. The court determined that his "testimony will not mislead the jury so long as he testifies only to defendant's and the alleged victim's possible location within a general area of coverage, as opposed to an exact location." *Id.* at 486.

2.

Horan testified at the jury trial (after J.T.'s testimony). He explained that he used Gladiator's software to process the results of his test and generate maps "that are the actual footprint of the cell tower[s]" that connected to J.T. and

Morgan's phones on the night of May 22.  Apr. 30, 2018 Trial Tr. 160:13–14, App. 1230.

Using those maps, Horan opined that at around 11:30 p.m. that night, J.T.'s phone connected to a T-Mobile tower whose coverage area was entirely within D.C.  He also presented a map showing the approximate location of J.T.'s phone at 11:58 p.m. and Morgan's phone at 12:09 a.m.  The map again showed coverage areas completely within D.C.  Last, Horan showed maps identifying the general location of Morgan's phone between approximately 12:11 and 1:04 am.  The last of those maps showed a coverage area that included Morgan's home in Maryland.

At the close of the weeklong jury trial, the jury convicted Morgan on the counts alleging transportation of a minor and attempted production of child pornography.  The jury instructions for the transportation charge did not require the jury to find that Morgan knew J.T.'s age when he transported her from D.C. to Maryland.

3.

The district court considered the remaining counts at a stipulated bench trial.  Morgan did not dispute that he had been previously convicted of an offense that required him to register as a sex offender under the Sex Offender Registration and Notification Act (SORNA).  He contended, however, that application of the registration requirement to individuals like him, who had been convicted of sex offenses before SORNA's enactment, violated the nondelegation doctrine.  The district court rejected that argument and found Morgan guilty of the two sex offender registration counts.  The court then sentenced Morgan to 480 months of imprisonment.

II.

Morgan first contends that the district court erred in admitting Horan's expert testimony about his drive tests. According to Morgan, the testimony should have been excluded either as unreliable under Federal Rule of Evidence 702 or as misleading under Federal Rules of Evidence 403. We disagree and sustain the district court's decision to admit Horan's testimony.

A.

We "must afford trial judges great discretion" in admitting or excluding expert testimony. *United States v. Day*, 524 F.3d 1361, 1367 (D.C. Cir. 2008). We thus review such decisions for an abuse of discretion. *United States v. McGill*, 815 F.3d 846, 903 (D.C. Cir. 2016). And we "grant[] a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999) (citing *General Electric Co. v. Joiner*, 522 U.S. 136, 143 (1997)).

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under the Rule, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify . . . if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court identified various factors that can inform the reliability analysis under Rule 702. Those factors include whether the expert's "theory or technique" (i) "can be (and has been) tested," (ii) "has been subjected to peer review and publication," (iii) has a high "known or potential rate of error," and (iv) enjoys "'general acceptance' within a "relevant scientific community." *Id.* at 593–94 (citation omitted). But the *Daubert* factors "do *not* constitute a definitive checklist or test" applicable in every case. *Kumho Tire Co.*, 526 U.S. at 150 (citation and quotation marks omitted).

The district court in this case did not abuse its discretion in admitting Horan's testimony under Rule 702.

*First*, Morgan understandably "is not challenging Horan's expert qualifications," Morgan Reply Br. 4, and does not dispute that Horan possesses the requisite "specialized knowledge." Fed. R. Evid. 702(a). Horan performs dozens of drive tests each year, teaches classes on drive testing, has a valid certification to use drive-test equipment, and has repeatedly been certified as an expert on cell phone analysis in cases involving drive tests. *Morgan*, 292 F. Supp. 3d at 478.

Nor does Morgan deny that Horan's testimony "help[ed] the trier of fact to . . . determine a fact in issue." Fed. R. Evid. 702(a). After all, the government needed to show that Moran drove J.T. from D.C. to Maryland in order to prove that he transported a minor in interstate commerce in violation of 18 U.S.C. § 2423(a). J.T. gave direct testimony to that effect, and Horan's drive-test testimony aimed to show that the approximate locations of Morgan's and J.T.'s cell phones during the evening supported her testimony.

*Second*, the district court reasonably determined that Horan's "testimony [was] based on sufficient facts or data." Fed. R. Evid. 702(b). On this score, Morgan's sole objection is that Horan drove an insufficient distance in carrying out the drive test. Morgan argues that, in light of the typical coverage radius of a cell tower, Horan's drive test did not encompass a large enough area to properly confirm the coverage range of the relevant towers.

The district court understood the issue: the court recognized that the "distance covered in a drive test can affect the accuracy of the results it produces," and noted the view expressed by Morgan's witness in the *Daubert* hearing "that Agent Horan did not drive far enough to produce an accurate drive test." *Morgan*, 292 F. Supp. 3d at 482–83. The court also took note of Horan's explanation that the signal distances of cell phone towers are more circumscribed "in an urban environment." *Id.* In ultimately allowing Horan to testify, the court left questions about the distances he drove in carrying out the drive test for the jury to consider in weighing the force of his presentation.

That decision was within the district court's discretion. *Daubert* cautions against being "overly pessimistic about the capabilities of the jury and of the adversary system generally." 509 U.S. at 596. And the *Daubert* Court emphasized that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* The district court justifiably concluded that concerns about the specific distances Horan drove in this case should be considered by the jury in assessing the weight of Horan's testimony, and not by the court in its threshold admissibility determination. *See id.* at 597.

13

Morgan's contention that Horan did not drive far enough from the relevant cell phone towers to develop complete coverage maps is not an indictment of drive-test methodology generally. Instead, his challenge concerns whether Horan's execution of the drive test in this case enabled gathering sufficient information to sustain a case-specific conclusion: that Morgan could not have been in Maryland when he connected to certain towers. And "efforts to discredit [an expert's] methodology by pointing to the limits of the research he undertook" generally "go[] to the weight rather than the admissibility of his testimony." *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996); *see also, e.g.*, *United States v. Hodge*, 933 F.3d 468, 478 (5th Cir. 2019); *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002).

In fact, Morgan acknowledges that there "would have been nothing wrong with" Horan's conduct of the drive test if the results been used to demonstrate only that the cell tower signals were "consistent" with J.T.'s testimony about Morgan's locations during the night. Morgan Br. 43. The problem, in Morgan's view, was that "the government wanted more than just 'consistency,'"—it instead ostensibly sought to "*exclude* Morgan being anywhere . . . in Maryland" at certain times. *Id.* Yet if Horan executed the drive test in a sufficiently sound manner to enable drawing *some* conclusions about J.T.'s and Morgan's cell phone locations at the relevant times, then questions about the adequacy of the test for a *particular* conclusion speak more about the weight of the evidence in supporting that conclusion than its admissibility at the outset. As we have explained, the admissibility of expert testimony turns not on "the accuracy of the conclusion" the expert proffers—a question generally left to the factfinder—but on "the soundness of the methodology" she employs. *Ambrosini*, 101 F.3d at 140.

To that end, Morgan could have cross-examined Horan about the area he drove relative to a cell tower's typical coverage radius, or pressed him about the possibility of undiscovered signal islands that might have placed Morgan in Maryland during relevant parts of the night. Morgan opted not to do so. In these circumstances, a threshold admissibility challenge under Rule 702 does not serve as a substitute for forgone opportunities to challenge the weight of expert testimony before the jury.

*Third*, the district court acted within its discretion in determining that Horan's testimony was "the product of reliable principles and methods." Fed. R. Evid. 702(c). The court acknowledged "that drive testing technology has been relied upon, tested and reviewed for decades in the multibillion dollar wireless communications industry." *See Morgan*, 292 F. Supp. 3d at 484 n.7 (citation and quotation marks omitted). Morgan's own expert echoed that understanding. Aug. 22, 2017 *Daubert* Hearing Tr. 31:14–21, App. 487; Oct. 11, 2017 *Daubert* Hearing Tr. 15:25–16:10, App. 655–56. And Morgan concedes that "the cell industry considers ESPA a useful tool for maximizing customer satisfaction." Morgan Br. 39. While industry and law enforcement use the results of their drive tests for different ultimate purposes, the direct objective of a drive test performed by either user is the same: to map the coverage of a cell tower. *See* Daniel, *supra*, at 69–71. It is perhaps unsurprising, then, that drive testing has become somewhat common in law enforcement settings. *See, e.g.*, *State v. Montanez*, 197 A.3d 959, 979 (Conn. App. Ct. 2018); *Nelson*, 533 F. Supp. 3d at 786.

The district court also analogized drive testing to a similar technique that enjoys widespread use by law enforcement: historical cell-site analysis. Courts have generally found historical cell-site analysis to be reliable and admissible. *See*

*United States v. Hill*, 818 F.3d 289, 295–99 (7th Cir. 2016); *see also United States v. Pembrook*, 876 F.3d 812, 824–25 (6th Cir. 2017), *vacated on other grounds*, *Calhoun v. United States*, 139 S. Ct. 137 (Mem.) (2018). At a high level, historical cell-site analysis entails examining a cell phone's historical records, determining the tower to which the phone connected at a particular time, and using a rough estimate of the coverage "wedge" of the tower to narrow down the general location of the cell phone at that time. *See, e.g.*, *United States v. Jones*, 918 F. Supp. 2d 1, 3, 5 (D.D.C. 2013); *Hill*, 818 F.3d at 295–96. Drive testing aims to ascertain the contours of a cell tower's coverage area with greater precision by collecting radiofrequency signals from the tower. *Morgan*, 292 F. Supp. 3d at 480; Oct. 11, 2017 *Daubert* Hearing Tr. 13:22–14:1, App. 653–54. But both methods rest on the same, overarching principle: that coupling information about a tower's coverage radius with the time at which a phone connected to it can help ascertain the phone's approximate location at that time. *Morgan*, 292 F. Supp. 3d at at 482.

The district court, though, was not content to "accept drive testing as reliable simply because of its similarities to historical cell-site analysis," *Morgan*, 292 F. Supp. 3d at 479. Rather, the court assessed each step of the drive-test methodology in substantial detail. *Id.* at 479–85. It did so in part to assure itself that the government had "adequately addressed potential sources of error in drive testing methodology." *Id.* at 479. And it concluded that "drive testing testimony is sufficiently reliable." *Id.* at 485.

Morgan takes issue with the government's failure to identify independent testing or sufficient peer review of drive testing. It is true that *Daubert* listed, as one factor potentially bearing on a court's assessment of admissibility under Rule 702, whether the technique in question "has been subjected to

peer review and publication." 509 U.S. at 593. But the *Daubert* factors "may or may not be pertinent in assessing reliability" in specific circumstances. *Kumho Tire*, 526 U.S. at 150 (citation and quotation marks omitted). Of particular relevance, it "might not be surprising in a particular case . . . that a claim made by a scientific witness has never been the subject of peer review." *Id.* at 151.

Here, the district court understandably declined to "automatically exclude evidence because it is too new, or of too limited outside interest, to generate extensive independent research or peer-reviewed publications." *Morgan*, 292 F. Supp. 3d at 484; *see also Ambrosini*, 101 F.3d at 134. And the court reasonably found that the wide acceptance of drive testing by engineers in the wireless industry, coupled with its use in law enforcement, offered sufficient indicia of reliability to overcome the lack of independent studies of the relatively newer practice. *Morgan*, 292 F. Supp. 3d at 484 & n.7 (citing *Daubert*, 509 U.S. at 594).

Morgan also challenges the reliability of Horan's testimony on the ground that Horan could not explain the computer algorithms that processed the drive-test data and generated the coverage maps. But we have never held that Rule 702 requires an expert to have a sophisticated understanding of the software underlying her technological tools. *Cf. United States v. Chiaradio*, 684 F.3d 265, 278 (1st Cir. 2012). If we required expert witnesses to have detailed knowledge of the software underlying their testimony, they could almost never testify on matters related to proprietary technology. For example, "anyone who testifies using any basic software such as Excel . . . to provide financial analysis[] would be required to be an expert in the algorithms by which Excel codes its formula and calculations." *Nelson*, 533 F. Supp. 3d at 798 (citation and quotation marks omitted).

Federal Rule of Evidence 702 does not compel that result. The touchstone of Rule 702 is reliability. Even if Horan could not explain the inner workings of the software that generated the drive-test maps, he could assure the reliability of his drive test and the maps it generated through other means. Horan was indisputably qualified to testify about a technological tool that has earned wide acceptance in a relevant industry, and he used the tool in its customary manner. His inability to explain a proprietary algorithm did not pose a categorical bar to a finding of reliability.

*Fourth*, and finally, the district court reasonably found that Horan "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(d). Following its step-by-step assessment of drive-test methodology generally, the court examined the methodology "as applied in this case" to confirm that Horan's testimony would be based on a reliable use of the drive test. *Morgan*, 292 F. Supp. 3d at 479. The court explained, for instance, that to produce reliable results, agents must make sure there were no changes to the tower or cellular network between the time of the relevant incident and the time of the test. *Id.* at 480. Horan did that here. *Id.* Also, after the completion of a drive test, another agent must "peer review" the draft analysis produced by the processing program. *Id.* at 481–82. That process worked as it should have in this case: Horan had "input a wrong code" during his draft analysis, "but the peer review process corrected the error" and found no other ones. *Id.* at 482. In response, Morgan makes no independent argument under Rule 702(d) that he has not already made elsewhere, and we have found those arguments unpersuasive for the reasons explained.

On the record before us—and mindful of the admonition that "the trial judge must have considerable leeway in deciding

. . . how to go about determining whether particular expert testimony is reliable," *Kumho Tire Co.*, 526 U.S. at 152—we conclude that the district court did not abuse its discretion in finding Horan's testimony to be sufficiently reliable.

B.

Morgan also contends that Horan's expert testimony should have been excluded under Rule 403. Under Rule 403, a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. As with Rule 702 challenges, "we review a trial judge's application of Rule 403 for abuse of discretion." *United States v. Ring*, 706 F.3d 460, 471 (D.C. Cir. 2013) (citation and quotation marks omitted).

Horan's testimony had significant probative value. It gave the jury information about Morgan and J.T.'s whereabouts on the night in question. *See, e.g.*, *Jones*, 918 F. Supp. 2d at 6. And it supported J.T.'s account that Morgan had transported her across state lines—an essential element of the transportation charge under 18 U.S.C. § 2423(a).

Morgan's primary concern was that Horan could mislead the jury by implying he could pinpoint the precise location of Morgan's and J.T.'s phones. But the district court addressed that concern by admitting Horan's testimony "with the qualification that [he] may not testify or imply that he can pinpoint a person's exact location using drive testing." *Morgan*, 292 F. Supp. 3d at 476–77. And Horan's trial testimony complied with that condition. He showed the jury maps with shaded areas representing cell tower coverage, and he testified only that the phones were located somewhere

within those large shaded zones. Horan also reiterated that he could not "narrow [the location] down any further" than the large colored areas. Apr. 30, 2018 Trial Tr. 167:15–16, App. 1237. To the extent Morgan believes the borders of the shaded areas should have been characterized as imprecise or less "definitive[]," Morgan Br. 47, the defense could have cross-examined Horan on that point or introduced the testimony of its own expert.

In light of the probative value of Horan's testimony and the deference we afford district courts in making determinations under Rule 403, we cannot say that the district court here abused its discretion in allowing the jury to hear from him.

III.

We now turn to Morgan's challenge to the jury instructions for the transportation charge under 18 U.S.C. § 2423(a). Section 2423(a) provides: "A person who [1] knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States, [2] with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title and imprisoned not less than 10 years or for life." 18 U.S.C. § 2423(a) (numbers in brackets added). We will refer to the first clause as the "knowingly clause" and to the second as the "intent clause."

Under the intent clause, the defendant must intend for the transported minor to engage either in "prostitution" or in "any sexual activity for which any person can be charged with a criminal offense." *Id.* This case involves the latter, and the

underlying "criminal offense" is section 3-307(a)(4) of the Maryland Criminal Code. That provision bars any person who is 21 or over from engaging in a sexual act with a victim who is 14 or 15. Md. Code Ann., Crim. Law § 3-307(a)(4). At the time of the offense, Morgan was 55 and J.T. was 15. It is settled as a matter of Maryland law that, to violate section 3-307(a)(4), the defendant need not know that the victim is under 16. *See Moore v. State*, 882 A.2d 256, 269 (Md. 2005).

The district court instructed the jury that it was unnecessary for the government to prove that Morgan knew J.T. was underage at the time of the offense. In Morgan's view, the district court's instruction was inconsistent with both the knowingly and intent clauses of section 2423(a). With regard to the knowingly clause, Morgan contends that the statute required the jury to find that he knew J.T. had "not attained the age of 18" at the time of the offense. 18 U.S.C. § 2423(a). As for the intent clause, Morgan submits that the statute required the jury to find that he knew J.T. was under 16, the relevant age of consent in the incorporated Maryland "criminal offense." *Id.*

Morgan preserved those statutory interpretation arguments before the district court, so we review them de novo. *See United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1237 (D.C. Cir. 2008). We reject them both. We conclude that, while section 2423(a) required proof that J.T. in fact was underage (under 18 for purposes of the knowingly clause and under 16 for purposes of the intent clause), the statute did not require proof that Morgan *knew* J.T. was underage. It was enough that Morgan knowingly transported her across state lines with the intent that she would engage in sexual activity for which he could be charged: sexual contact with a person under 16 by a person 21 or over.

21

A.

The knowingly clause of section 2423(a) covers a "person who knowingly transports an individual who has not attained the age of 18." 18 U.S.C. § 2423(a). We begin by considering whether "knowingly" requires that the defendant knew the individual he transported was under 18 in order to be convicted under section 2423(a). We hold that it does not.

"Whether a criminal statute requires the Government to prove that the defendant acted knowingly is a question of congressional intent." *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) (citing *Staples v. United States*, 511 U.S. 600, 605 (1994)). Here, the terms of section 2423(a) make plain that the defendant must act "knowingly" when "transport[ing] an individual." 18 U.S.C. § 2423(a). The question is whether the term "knowingly" also applies to the ensuing element in the statutory text: that the transported individual "has not attained the age of 18." *Id.* Must the defendant know that the transported individual is under 18, or is it enough if the transported individual in fact is under 18 regardless of the defendant's knowledge of her age?

In addressing that question, we "start from a longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'" *Rehaif*, 139 S. Ct. at 2195 (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)); *accord Ruan v. United States*, No. 20-1410, slip op. at 5 (U.S. June 27, 2022). Courts "refer[] to this culpable mental state as scienter," *Ruan*, slip op. at 5 (quotation marks omitted), and thus to the "longstanding presumption" as one "in favor of scienter," *Rehaif*, 139 S. Ct. at 2195 (quotation marks omitted). And when a statute already "includes a

general scienter provision, the presumption applies with equal or greater force to the scope of that provision." *Ruan*, slip op. at 6 (emphasis, quotation marks, and citation omitted). Under the presumption, then, "a word such as 'knowingly' modifies not only the words directly following it, but also those other statutory terms that separate wrongful from innocent acts." *Id.* (quotation marks and citation omitted).

In that context, moreover, the presumption in favor of scienter is reinforced by the way in which courts generally construe the reach of an adverb like "knowingly" as "a matter of ordinary English grammar." *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009). As relevant here, "courts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element." *Id.* at 652. Accordingly, both because of that rule of construction and because of the way the presumption favoring scienter operates, the word "knowingly" in a criminal statute would typically apply to all offense elements that follow it. If that presumptive understanding governed in this case, "knowingly" in section 2423(a) would apply to the offense's under-18 element.

Here, though, the presumptive understanding does not control. As is true of any presumption, there can be a "convincing reason to depart from the ordinary presumption in favor of scienter." *Rehaif*, 139 S. Ct. at 2195; *see Ruan*, slip op. at 7–8. Likewise for the ordinary textual understanding of the operation of the word "knowingly" in criminal statutes: that understanding is "a contextual one," subject to being overcome in "special context[s]." *Flores-Figueroa*, 556 U.S. at 652. Section 2423(a) presents just such a circumstance. In *Flores-Figueroa*, in fact, Justice Alito's concurring opinion specifically discusses section 2423(a) as an "instance[] in which context may well rebut [the] presumption" that a

"specified *mens rea* applies to all the elements of an offense." *Id.* at 660 (Alito, J., concurring in part and concurring in judgment). As he observed, the "Courts of Appeals have uniformly held that a defendant need not know the victim's age to be guilty under this statute." *Id.* (citing decisions).

The context of section 2423(a) is sex crimes involving minors. And it is well understood, as the *Flores-Figueroa* Court explained, that "many sex crimes involving minors do not ordinarily require that a perpetrator know that his victim is a minor." *Id.* at 653. Indeed, "the common-law presumption of *mens rea* . . . expressly excepted 'sex offenses, such as rape, in which the victim's actual age was determinative despite defendant's reasonable belief that the girl had reached [the] age of consent.'" *X-Citement Video*, *Inc.*, 513 U.S. at 72 n.2 (quoting *Morissette v. United States*, 342 U.S. 246, 251 n.8 (1952)); *see United States v. Burwell*, 690 F.3d 500, 537 n.10 (D.C. Cir. 2012) (en banc) (Kavanaugh, J., dissenting) ("The most well-known offense elements that were historically applied in a strict liability manner [include] the victim's age in a statutory rape case . . . .").

The purpose of declining to require knowledge of the victim's age in the context of sex offenses involving minors is apparent: protection of minors. Our court's decision in a closely related context in *United States v. Chin*, 981 F.2d 1275 (1992) (R.B. Ginsburg, J.), *cert. denied*, 508 U.S. 923 (1993), is instructive in that regard. That case involved 21 U.S.C. § 861(a), which makes it a crime to "knowingly and intentionally . . . employ, hire, use, persuade, induce, entice, or coerce, a person under eighteen years of age to assist in avoiding detection or apprehension for" listed federal drug offenses. The question we faced is whether the statute's scienter language—"knowingly and intentionally"—applies to the under-18 element. *Chin*, 981 F.2d at 1279. That is, does

the defendant need to have known that the person he hired, used, induced, etc., was under 18? We answered that question in the negative, reasoning that the "objective of protecting juveniles as a class strongly indicates that Congress meant to impose on the drug dealer the burden of inquiry and the risk of misjudgment." *Id.* at 1280. Under section 2423(a), similarly, declining to require knowledge of the transported minor's age would "protect young persons who are transported for illicit purposes, and not transporters who remain ignorant of the age of those whom they transport." *United States v. Taylor*, 239 F.3d 994, 996 (9th Cir. 2001).

Following the course charted by our decision in *Chin*, we join every court of appeals to have addressed the question in holding that "knowingly" in section 2423(a) does not require the defendant to know that the person transported across state lines for criminal sexual activity was under 18. *See United States v. Tavares*, 705 F.3d 4, 18–20 (1st Cir. 2013); *United States v. Griffith*, 284 F.3d 338, 350–51 (2d Cir. 2002); *United States v. Tyson*, 947 F.3d 139, 142–44 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 307 (2020); *United States v. Washington*, 743 F.3d 938, 941–43 (4th Cir. 2014); *United States v. Daniels*, 653 F.3d 399, 409–10 (6th Cir. 2011); *United States v. Cox*, 577 F.3d 833, 836–38 (7th Cir. 2009); *United States v. Taylor*, 239 F.3d 994, 997 (9th Cir. 2001); *United States v. Lacy*, 904 F.3d 889, 897–98 (10th Cir. 2018). That conclusion also squares with our own court's en banc decision in *United States v. Burwell*, in which we explained that "[c]ertain statutes involving juveniles, where the victim's age is an element of the offense . . . do not require proof of *mens rea* with respect to the juvenile's age." 690 F.3d at 508. As a principal example, we cited section 2423 and decisions construing it. *Id.* at 508 & n.3.

Morgan emphasizes that the uniform line of circuit court decisions (as well as our court's observation in *Burwell*)

"addressed the issue in the context of transport of a minor for *prostitution*—a crime with its own *mens rea*." Morgan Br. 68; *see Burwell*, 690 F.3d at 508 (describing section 2423 as "prohibiting transportation of juveniles across state lines for the purpose of prostitution"). Recall, in this regard, that section 2423(a) prohibits "knowingly transport[ing] an individual who has not attained the age of 18" to engage either "in prostitution" or "in any sexual activity" carrying a criminal charge. 18 U.S.C. § 2423(a). When the underlying crime is prostitution, Morgan reasons, the defendant is aware of the facts rendering the intended conduct wrongful by virtue of his intent that prostitution occur. But when the underlying crime is strict-liability sexual activity with a minor, he continues, the defendant may not know the fact rendering his conduct wrongful: that the transportee is under 18. In the latter situation, Morgan thus posits, requiring knowledge of the transportee's under-18 status would "advance the purpose of scienter"—"to separate wrongful from innocent acts"—by requiring a defendant to be on notice of the facts rendering his intended conduct criminal. *Rehaif*, 139 S. Ct. at 2197.

The upshot of Morgan's argument, however, cannot be squared with the statutory text. Section 2423(a) bars "knowingly" transporting a person "who has not attained the age of 18" to engage either in prostitution or some other criminal sexual activity. Under the structure of the provision, "knowingly" applies in a constant manner regardless of the underlying offense. There is no plausible reading under which "knowingly" does not require knowledge of under-18 status when the underlying offense is "prostitution" but does require knowledge of that status when the underlying offense is other criminal "sexual activity"—much less that the statute requires knowledge of under-18 status only in that *subset* of other "sexual activity" involving strict-liability sexual crimes against minors. The statute works in an all-or-nothing fashion: it

requires knowledge of under-18 status either for all underlying offenses or for none. And if it does not require knowledge that the transported person is under 18 in cases involving prostitution—as the circuits have uniformly held—it also does not require knowledge in cases involving other criminal sexual activity (including strict-liability sexual conduct with a minor).

At any rate, even if we look solely to circumstances in which the underlying offense is strict-liability sexual activity with a minor, applying the word "knowingly" to section 2423(a)'s under-18 element still cannot be the key to separating "wrongful from innocent acts." *Rehaif*, 139 S. Ct. at 2197. The broader statutory context demonstrates why.

A nearby provision, section 2421, defines an essentially identical transportation crime except that it contains no requirement concerning the transportee's age: "Whoever knowingly transports any individual in interstate or foreign commerce . . . with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense . . . shall be fined under this title or imprisoned not more than 10 years, or both." 18 U.S.C. § 2421. Sections 2421 and 2423(a) thus work in tandem in that they prohibit the same acts of transportation to engage in sexual crimes, but with the potential sentence rising from a maximum of 10 years (section 2421) to a minimum of 10 years (section 2423(a)) if the transportee is under 18. Because section 2421 operates as a lesser-included offense of section 2423(a), applying the word "knowingly" to the under-18 element in section 2423(a) would not separate wrongful from otherwise *innocent* conduct. Rather, any conduct within the compass of section 2423(a) is already a felony under section 2421.

To be sure, section 2423(a) markedly increases the potential sentence for that conduct if the transportee is under

18. But Congress made clear in section 2423 itself that it saw no issue with a substantial sentencing increase for a sexual offense when the victim is under 18, even if the defendant does not know (or has a mistaken belief about) the victim's under-18 status. Explaining the point requires working through an intricate set of nested provisions.

The starting point is section 2423(b), the immediately neighboring provision of section 2423(a). Section 2423(b) makes it a felony punishable by up to 30 years of imprisonment for a person to "travel[] in interstate commerce . . . with a motiving purpose of engaging in any illicit sexual conduct with another person." 18 U.S.C. § 2423(b). And "illicit sexual conduct" means certain defined sexual acts "with a person under 18 years of age," *id.* § 2423(f), including "a sexual act" that would violate federal law if it "occurred in the special maritime and territorial jurisdiction of the United States," *id.* § 2423(f)(1), or "any commercial sex act," *id.* § 2423(f)(2). Congress specified that, in the latter category, there is a mistake-of-age defense if the defendant can show by clear and convincing evidence that he "reasonably believed that the person with whom [he] engaged in the commercial sex act had attained the age of 18 years." *Id.* § 2423(g).

Congress did not provide for such a defense, though, if the underlying offense falls under section 2423(f)(1). As an example, there would be no mistake-of-age defense if the defendant traveled across state lines to engage in coerced sexual activity with a person who (unbeknownst to the defendant) was under 18, say, by administering an intoxicant that would temporarily impair the victim's mental capacity. *See id.* §§ 2241(b), 2423(b), 2423(f)(1). In that situation, based solely on the victim's under-18 status, the defendant would go from someone who has not committed a federal offense at all (because there is no analog to section 2423(b) for victims who

are over 18), to someone who has committed a felony subject to a 30-year sentence—even if the defendant had no knowledge of the victim's actual age. If the travel offense under section 2423(b) operates in that fashion, it stands to reason that the neighboring transportation offense under section 2423(a) likewise carries a substantial sentence when the victim is under 18, regardless of whether the defendant knows the victim's age.

If Congress nonetheless wanted section 2423(a) to function differently so as to require knowledge that the transportee is under 18, it could have made its intention clear by framing the text to cover a person "who knowingly transports an individual, *knowing that the individual* has not attained the age of 18," rather than speaking in terms of a "person who knowingly transports an individual who has not attained the age of 18." *Id.* § 2423(a). Congress employed precisely the former kind of formulation in a close-by provision, section 2425, which makes it a crime to "knowingly initiate[] transmission of [identifying information] of another individual, *knowing that such other individual has not attained the age of 16 years*, with the intent to entice, encourage, offer, or solicit any person to engage in any sexual activity for which any person can be charged with a criminal offense." *Id.* § 2425 (emphasis added).

Congress did not include that kind of language in section 2423(a). Absent such a specification, for the reasons we have set out, we think "knowingly" in that provision is best understood not to apply to its under-18 element.

## B.

Having addressed Morgan's argument under Section 2423(a)'s knowingly clause, we next consider his argument under the provision's intent clause. As applied in this case, that

clause covers transportation of a minor "with intent that the individual engage in . . . any sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. § 2423(a). Morgan contends that, when the underlying "criminal offense" is statutory rape, the word "intent" means that the defendant must know that the victim's age fell below the age of consent (which here is 16). We disagree.

The most natural reading of the intent clause calls for a two-step inquiry: first, did the defendant transport the minor "with intent" for her to engage in "sexual activity"? Second, if the intended sexual activity were to occur, could anyone be "charged with a criminal offense" for it? That second step renders section 2423(a) a "piggyback offense." *United States v. Ray*, 831 F.3d 431, 434 (7th Cir. 2016). It is not enough that the defendant intends for just *any* sexual activity to take place; "the prosecution must show that the [intended] sexual activity . . . violated [or would have violated] some other statute." *Id.*; *accord United States v. Cotto-Flores*, 970 F.3d 17, 36–37 (1st Cir. 2020).

Applying that two-step approach here, we conclude that the jury need not have found that Morgan knew J.T. was under 16 to convict him on the transportation charge. At step one of the inquiry, the jury concluded that Morgan intended for J.T. to engage in sexual activity with him when he drove her to Maryland. At step two, the question is whether that intended sexual activity was something for which a "person can be charged with a criminal offense." The answer is yes. The Maryland Criminal Code makes it unlawful for a person 21 or over (like Morgan) to engage in a sexual act with someone under 16 (like J.T.). Md. Code Ann., Crim. Law § 3-307(a)(3), (4). And because the Maryland crime "has no . . . *mens rea* element with regard to the victim's age," *Moore v. State*, 882 A.2d 256, 269 (Md. 2005) (quotations omitted), section

2423(a)'s intent clause—true to its piggyback nature—does not have one, either: the intended sexual activity "can be charged [as] a criminal offense" (in Maryland) regardless of whether Morgan knew J.T. was under 16 years old. 18 U.S.C. § 2423(a).

In resisting that understanding, Morgan says that the relevant question under section 2423(a)'s intent clause is whether the defendant intends to engage in criminal sexual activity (i.e. sexual activity for which a person can be charged with a criminal offense). And when the underlying offense is statutory rape, Morgan submits, section 2423(a)'s intent clause requires that the defendant know the victim is underage: otherwise, it cannot be said that the defendant intends to engage in *criminal* sexual activity. After all, Morgan reasons, the victim's age is what renders criminal an otherwise lawful sexual act.

For Morgan's interpretation to work, however, the following would need to be true: even if (a) the defendant has an intent that the transported minor engage in sexual activity, and even if (b) that sexual activity is conduct for which a person can be charged with a criminal offense, it nonetheless is untrue that (c) the defendant has an "intent" that the transported minor "engage in . . . sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. § 2423(a). Given that (c) is just a verbatim agglomeration of (a) and (b), the notion that (c) could be untrue even if (a) and (b) were true is, at the least, an uneasy fit with the statutory text. And here, (a) and (b) are both true.

On that score, because Morgan does not appear to contest the truth of (a), his only point of disagreement presumably concerns (b). That is, Morgan would have to submit that (b) could not be true here unless he knew J.T. was under the age of

16. But when, as in this case, the sexual activity at issue is covered by a strict-liability offense, that activity by definition is conduct for which a "person can be charged with a criminal offense" as long as the victim was in fact below the age of consent—regardless of the defendant's knowledge of the victim's underage status. So, (b) is satisfied here. Both (a) and (b) are thus true, in which case (c) should be as well.

Morgan might also resist the framing of (b) in that, in his view, the pertinent question is not just whether the intended sexual activity would be criminally chargeable, but is whether the defendant *intended* that the intended sexual activity would be criminally chargeable. That rationale would rest on reading the word "intent" in the statute to modify not only the adjacent phrase, "to engage in . . . sexual activity," but also the ensuing phrase, "for which any person can be charged with a criminal offense." 18 U.S.C. § 2423(a).

We, however, read the word "intent" to modify "engage in . . . sexual activity" but not to reach "for which any person could be subject to a criminal charge." We do so for largely the same reasons that, under the knowingly clause, we read the word "knowingly" to modify "transports an individual" but not to reach "who has not attained the age of 18": when the context is sex offenses involving minors, general canons and presumptions about *mens rea* in criminal statutes are inapplicable to the element of underage status, in service of the interest in protecting minors. *See Flores-Figueroa*, 556 U.S. at 653; *X-Citement Video, Inc.*, 513 U.S. at 72 n.2; *Burwell*, 690 F.3d at 537 n.10 (Kavanaugh, J., dissenting); *Chin*, 981 F.2d at 1279–80. (As an aside, we note that Morgan's reading in fact rests on more than concluding that "intent" modifies "for which any person could be subject to a criminal charge," in that he would ask whether the defendant *knows* (as opposed to *intends*) that the sexual activity would be chargeable. Morgan Br. 58.

But because we conclude that "intent" does not reach "for which any person could be subject to a criminal charge," we need not consider whether "intends" and "knows" would carry essentially the same meaning in this specific situation.)

Morgan's interpretation of the intent clause, moreover, is difficult to square with the broader structure of the statute. Recall that the neighboring provision, section 2423(b), prohibits traveling across state lines "with a motivating purpose of engaging in any illicit sexual conduct with another person," where "illicit sexual conduct" is defined to include certain sexual acts "with a person under 18." *Id.* § 2423(b), (f)(1)–(2). If we assume that "a motivating purpose" is essentially synonymous with an "intent"—and, in fact, the title of section 2423(b) is "Travel *with intent* to engage in illicit sexual conduct," *id.* (emphasis added)—then the operation of section 2423(b) parallels the operation of section 2423(a)'s intent clause as applied to statutory rape: both provisions prohibit the taking of an act (transportation or travel) while having an intent (or motivating purpose) that someone engage in criminal/illicit sexual activity, where the criminal/illicit nature of the sexual activity turns on the victim's underage status.

Under Morgan's argument, he could not have intended for J.T. to engage in criminal sexual activity for purposes of section 2423(a)'s intent clause unless he knew J.T. was underage. But under section 2423(b), incongruously, Congress made clear that a defendant can have an intent to engage in illicit sexual activity even if he does not know the victim is underage. We know this because Congress established a reasonable-mistake-of-age defense for certain applications of section 2423(b). *See* 18 U.S.C. § 2423(g). And there could be no reason to enact a reasonable-mistake-of-age defense if the government were required to prove knowledge of age in the first place. The result is that a defendant can have an intent to

engage in *illicit* sexual conduct under section 2423(b) regardless of whether he knows the victim's underage status, even when that status is what makes the conduct illicit for purposes of section 2423(b). *See id.* § 2423(f). Assuming Congress would envision parallel and neighboring provisions to work in parallel ways, section 2423(b) suggests that a defendant likewise can have an intent to engage in *criminal* sexual activity under section 2423(a)'s intent clause regardless of whether he knows the victim's underage status, even when (as in this case) that status is what makes the activity criminal.

That interpretation is reinforced by the intent clause's statutory purpose. In framing the clause to encompass transportation of a minor to engage in "any sexual activity" chargeable as "a criminal offense," *id.* § 2423(a), Congress criminalized transportation for "illegal sexual activity under *any* applicable law—Federal, State or local." H.R. Rep. No. 99-910, at 8 (1986) (emphasis added). And in structuring the intent clause in that way, Congress conformed the federal prohibition against transportation for criminal sexual activity to the relevant "community standards regarding acceptable sexual behavior." *Id.* Congress, that is, sought to fortify community standards about permissible sexual behavior by barring transportation into a state for sexual activity that would violate that state's laws.

Here, that state is Maryland. And section 3-307(a)(4) of the Maryland Criminal Code codifies a strict community standard for acceptable sexual behavior. Maryland determined that individuals who are 21 or over commit a felony by engaging in sexual conduct with anyone under 16, Md. Code Ann., Crim. Law §§ 3-304(a)(3), 3-307(a)(4), regardless of whether the adult knows the minor's age, *see Moore*, 882 A.2d at 269. Section 3-307(a)(4) thereby embodies Maryland's judgment that, to adequately protect minors, it is acceptable—

and indeed necessary—to criminalize sexual contact by an adult with someone under 16 even if the adult is unaware of the victim's underage status. In section 2423(a), Congress sought to incorporate Maryland's understanding of acceptable sexual behavior in circumstances in which a person transports a minor into that state to engage in sexual activity there. Morgan's interpretation, though, would do the opposite, denying Congress's evident purpose to give effect to Maryland's community standards for acceptable sexual behavior by criminalizing the transport of minors into the state to engage in sexual activity there that the state deems a crime.

Morgan responds by asserting that the Maryland Court of Appeals has declined to recognize a common-law crime of *attempted* violation of section 3-307(a)(4) of the Maryland Criminal Code. *See Moore*, 882 A.2d at 268–70; *but see Maxwell v. State*, 895 A.2d 327, 334 (Md. Spec. App. 2006) (limiting *Moore*). Morgan further notes that section 2423(a), like an attempt charge, does not require completion of the underlying offense. In that light, Morgan suggests, it would be more consistent with Maryland's standards to deny the application of section 2423(a) to that state's strict-liability offenses unless there is a requirement to prove a defendant's knowledge of underage status.

It is far from clear that Morgan's understanding of Maryland attempt law is correct, *see Maxwell*, 895 A.2d at 334, but even assuming it is, Morgan's reasoning is misconceived. While both section 2423(a) and a state-law attempt charge concern steps undertaken on the way to completing an underlying sex crime, Congress made an independent judgment that, regardless of the contours of a given state's attempt law, there is a strong federal interest in establishing a strict federal criminal bar against transporting a minor to engage in sexual activity that would violate state law if

completed. True, the scope of the underlying sex offense is defined by state law, and Congress sought to respect a state's own standards of what is acceptable (and impermissible) in that important regard. But once the scope of the underlying state-law offense is given effect, section 2423(a)'s ban on transporting a minor to engage in that state-law offense is an independent—and serious—federal wrong. No one could suggest, for instance, that if a state opted to do away entirely with attempt charges for sex crimes, then section 2423(a) somehow would cease to operate altogether against transportation of a minor to engage in a sex crime in that state. Nor could anyone suggest that, if a state penalizes attempt to engage in a sex crime with a minor less strictly than does section 2423(a), then the available federal sentence somehow would be capped in a commensurate manner.

Additionally, even if the shape of a state's attempt law did have bearing on the meaning of "intent" under section 2423(a), there would be a significant mismatch between Morgan's reasoning and his remedy. Morgan would allow a section 2423(a) charge when the underlying state-law crime falls under section 307(a)(4) of the Maryland Criminal Code but would require the jury to find knowledge of the victim's underage status. Morgan makes no suggestion, though, that his proposed approach maps onto anything in existence under Maryland law. Maryland does in fact criminalize antecedent steps tied to a violation of section 3-307(a)(4) in certain circumstances, *see* Md. Code Ann., Crim. Law § 3-324(b), but Morgan does not purport to conform his interpretation of section 2423(a) to that offense. Indeed, Morgan's approach would affirmatively contradict state attempt law in some situations: his approach would impose a blanket requirement to prove knowledge of underage status under section 2423(a) when the underlying crime is a strict-liability offense, even if the relevant state's laws contain an attempt offense that operates in a strict-liability

fashion as to age. *See, e.g., State v. Sines*, 579 S.E.2d 895, 900 (N.C. App. Ct. 2003).

The purpose of section 2423(a)'s intent clause, in short, is to incorporate a state's standards of what is acceptable sexual behavior, not to mirror a state's decisions about the scope of its attempt law. With that understanding in mind, Morgan's reading of the intent clause conflicts with Maryland's relevant judgments (and those of Congress).

\* \* \*

The statutory text, structure, and purpose all point to the same conclusion about the proper interpretation of section 2423(a)'s intent clause as applied to this case: Morgan transported J.T. across state lines "with intent that [she] engage in . . . sexual activity for which [he could] be charged with a criminal offense," regardless of whether he knew she was under 16. 18 U.S.C. § 2423(a). And as we determined earlier in the context of the provision's knowingly clause, Morgan also "knowingly transport[ed] an individual who has not attained the age of 18," regardless of whether he knew J.T. was under 18. *Id.*

In a last argument, Morgan contends that, even if section 2423(a) can be read in that way, the rule of lenity should tip the balance in favor of his contrary interpretation. We think, however, that there is no "grievous ambiguity" here of the sort that would bring lenity principles into play. *E.g., Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016). Significantly, our court reached that conclusion in *United States v. Chin*, which, as explained, involved a related criminal offense that likewise turns on a person's status as a minor, 18 U.S.C. § 861(a). In holding that the statute did not require proof that the defendant had knowledge of the minor's age, we rejected the defendant's

reliance on the rule of lenity. *Chin*, 981 F.2d at 1280. We explained that "the requisite legislative intent," even if "imperfectly expressed," was "fairly implied" to an adequate extent that resort to lenity principles was unjustified. *Id.* We conclude the same here.

We note, finally, one issue we need not reach. In arguing that section 2423(a) is best read to require proof that he knew J.T.'s underage status, Morgan highlights various factual scenarios in which there may be no face-to-face interaction between the defendant and the transported minor (for instance, if the defendant commissions the transport of a minor without directly participating in it). In those sorts of situations, the possibility of a reasonable mistake about the victim's age may be enhanced because the defendant might never lay eyes on the victim.

There is no occasion for us to treat with such circumstances in this case because Morgan met J.T. in person and interacted with her before transporting her across state lines. Morgan thus could not (and does not) make any argument that his conduct should fall outside the ambit of section 2423(a) due to the lack of face-to-face engagement with J.T. And as a result, we have no occasion to consider whether those kinds of circumstances might conceivably be distinct in some fashion that could matter under the statute in cases involving strict-liability offenses.

In *X-Citement Video, Inc.*, the Supreme Court indicated that there may be a lesser need to give effect to the "common-law presumption of *mens rea*" in circumstances in which "the perpetrator confronts the underage victim personally and may reasonably be required to ascertain that victim's age." 513 U.S. at 72 n.2; *see id.* at 76 n.5; *United States v. Robinson*, 702 F.3d 22, 32 (2d Cir. 2012) ("But that presumption [of *mens rea*] does

not apply to sex crimes against minors, at least 'when the perpetrator confronts the underage victim personally.'" (citation omitted) (quoting *X-Citement Video, Inc.*, 513 U.S. at 72 n.2)); *cf.* 18 U.S.C. § 1591(c) (providing that the government "need not prove that the defendant knew . . . that [a sex-trafficking victim] had not attained the age of 18" if "the defendant had a reasonable opportunity to observe the person"). We have no reason here to consider the potential salience (if any) of that logic in the perhaps unlikely event that the government would pursue a section 2423(a) charge against someone who had no in-person interactions with the minor and whose underlying sex offense is a strict-liability one. This case does not involve that situation, and in the circumstances at hand, we find no error in the district court's instruction to the jury that it need not find Morgan knew of J.T.'s underage status to find him guilty of violating section 2423(a).

IV.

Morgan briefly raises a final challenge that he acknowledges is foreclosed by Supreme Court precedent. He contends that his convictions based on SORNA registration obligations are predicated upon an unconstitutional delegation of legislative authority to the Attorney General. The Supreme Court rejected that precise challenge in *Gundy v. United States*, 139 S. Ct. 2116, 2121–24 (2019). Morgan concedes as much, explaining that he raises the argument only to preserve his ability to argue to the Supreme Court that it should reconsider *Gundy* and adopt the position advanced by the dissent in that case. He remains free to do so, but for purposes of our court, we must reject his argument based on *Gundy*.

39

* * * * *

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*