*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CF-0196

RAKEEM WILLIS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2019-CF1-007968)

(Hon. Michael Ryan, Trial Judge)
(Hon. Milton C. Lee Jr., Motions Judge)

(Argued September 24, 2025          Decided November 20, 2025)

(Amended March 19, 2026*)

*Stefanie Schneider*, Public Defender Service, with whom *Jaclyn Frankfurt* and *Alice Wang*, Public Defender Service, were on the briefs, for appellant.

*David B. Goodhand*, Assistant United States Attorney, with whom *Edward R. Martin*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *Ariel Dean*, and *Michael Spence*, Assistant United States Attorneys, were on the brief, for appellee.

---

* After the November 20, 2025, initial publication of this opinion, the division granted in part appellee's petition for rehearing on March 19, 2026. The division amended the opinion by adding a discussion of remedy at the end of section II.A.3 and adding section II.B, along with attendant changes elsewhere.

Before EASTERLY and SHANKER, *Associate Judges*, and RUIZ, *Senior Judge*.

SHANKER, *Associate Judge*: Late one night in January 2019, Sean Shuler, Javon Abney, and Tyrik Hagood were shot and killed on the 1500 block of Fort Davis Place in Southeast, Washington, D.C. Appellant Rakeem Willis, along with his codefendant Jonathan Winston, was charged with three counts of first-degree (premeditated) murder for the deaths of the three men. During pretrial proceedings in Superior Court, the motions court admitted the testimony of the government's historical cell site location information (CSLI) expert over objections from Mr. Winston.[1] Following a jury trial, Mr. Willis was convicted of all three counts of first-degree murder and one count of fleeing a law enforcement officer.[2] Mr. Willis appeals these convictions on three grounds.

First, Mr. Willis asserts that the motions court erred in its analysis under *Motorola Inc. v. Murray*, 147 A.3d 751, 756 (D.C. 2016) (en banc), and Federal Rule of Evidence 702 when admitting the expert testimony of Federal Bureau of Investigation (FBI) Special Agent Billy Shaw, a member of the Bureau's Cellular Analysis Survey Team (CAST). Specifically, he contends that the motions court

---

[1] Because the judge who presided over the motions proceedings and the judge who presided over trial were different, we refer in this opinion to the "motions court" and the "trial court" as appropriate.

[2] The trial court granted Mr. Winston's motion for a judgment of acquittal at the conclusion of the government's case in chief.

failed to properly determine whether Special Agent Shaw's testimony was the product of reliable principles and methods and to consider whether Special Agent Shaw reliably applied the methodology to the facts of this case. Second, Mr. Willis argues that the motions court erred when it found that the government's notice regarding Special Agent Shaw's expert testimony satisfied Superior Court Rule of Criminal Procedure 16. Third, Mr. Willis contends that the trial court abused its discretion in declining to disqualify a juror based on indications that the juror was sleeping or was otherwise inattentive throughout trial.

We hold that the motions court's *Motorola*/Rule 702 analysis fell short of what is required by both Rule 702 and our case law. We also conclude that this error was not harmless and warrants reversal of Mr. Willis's murder convictions. The expert testimony did not, however, bear on Mr. Willis's charge of fleeing a law enforcement officer, and, because we see no abuse of discretion in the trial court's handling of the juror issue, we affirm that conviction. Accordingly, we reverse in part and affirm in part and remand for further proceedings consistent with this opinion, including, if the government so chooses, a new trial on the murder charges.

## I. Background

The evidence at trial included the following. Two witnesses who lived on the 1500 block of Fort Davis Place testified that, on the night Messrs. Shuler, Abney,

and Hagood were murdered (January 26, 2019), they heard gunshots around 10:00 p.m. and saw two "silhouette[s]" shooting into a vehicle. As the shooters drove away, one got out of their vehicle and stood over Mr. Shuler's body and "mess[ed]" with it. The car then drove off and neither witness was able to identify the make of the car or its license plate number. When police responded, they found Mr. Shuler's body in the middle of the road and the bodies of Mr. Abney and Mr. Hagood seated in a parked car with the engine running and the windows and driver's door open. A medical examiner concluded that all three men died from multiple gunshot wounds.

About an hour after the shooting, in Capitol Heights, Maryland, police responded to a report of a black Lexus on fire. At trial, the government introduced video footage purporting to show that this Lexus was the car used by the shooters on the night of the murders. Police later searched the car and found parts of a Glock 27 handgun, bullets, and cartridge casings. The government's firearms expert testified that the ammunition recovered from the murder scene did not match the Glock 27.

Phone numbers and related call records connected Mr. Willis to Mr. Shuler. The government introduced evidence indicating that, at the time of the murders, Mr. Willis used two different phone numbers: one with a 443 area code and another with a 240 area code. Call records showed calls between Mr. Shuler's number and

Mr. Willis's 443 number throughout the afternoon of January 26. The records also revealed calls between Mr. Shuler's number and Mr. Willis's 240 number from shortly after 6:00 p.m. until just before 10:00 p.m. that night. The calls between Mr. Shuler's number and the numbers associated with Mr. Willis stopped around 10:00 p.m. The 443 number linked with Mr. Willis made a call to an IHOP restaurant in Maryland just before midnight.

The government presented a historical CSLI expert, FBI Special Agent Shaw, who used this phone activity to chronicle the approximate movement of the relevant phones on the night of the murders. Using the locations of the cell towers that the phone numbers connected with, Special Agent Shaw showed the 240 number linked with Mr. Willis moving towards an area in the vicinity of the shootings shortly before 10:00 p.m. He then showed the 443 number moving northbound on I-295 and converging with an alleged co-conspirator approximately where the burned-out Lexus was later found. The cell site evidence further revealed the 443 number being used just south of the IHOP restaurant where Mr. Willis was later identified on surveillance footage by a law enforcement officer.

Police subsequently obtained a warrant for Mr. Willis's arrest and, when they tried to stop Mr. Willis's car, he led them on a high-speed chase that ended when he crashed his car and fled on foot. After a police canine sniffed the abandoned car, the

police tracked and ultimately found Mr. Willis hiding under a porch. They also recovered a bag with $5,920 in cash and two cell phones nearby.

The jury found Mr. Willis guilty of three counts of first-degree murder and one count of fleeing a law enforcement officer. The trial court sentenced Mr. Willis to 120 years of imprisonment, consisting of consecutive forty-year terms for each murder conviction and a concurrent five years for the flight conviction. This appeal followed.

## II.    Analysis

Mr. Willis raises three issues on appeal. We hold that the motions court improperly exercised its discretion when assessing the reliability of Special Agent Shaw's expert testimony under *Motorola* and Federal Rule of Evidence 702, that the error was not harmless, and that the error warrants reversal of Mr. Willis's murder convictions but not his flight conviction (to which the CSLI evidence was not relevant). In light of our *Motorola*/Rule 702 holding, we need not reach Mr. Willis's Rule 16 claim. Mr. Willis's remaining claim about the inattentiveness of a juror is pertinent to his flight conviction, but we conclude that the trial court did not abuse its discretion in declining to disqualify the juror. Accordingly, we affirm the conviction for fleeing a law enforcement officer.

## A.    *Motorola*/Rule 702

### 1.    *Additional Background*

In deciding the admissibility of expert testimony, a court must consider whether:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*Faltz v. United States*, 318 A.3d 338, 348 (D.C. 2024) (quoting *Motorola*, 147 A.3d at 756); *see* Fed. R. Evid. 702.[3]  "The Rule [ ] elevates the trial judge's role as gatekeeper; it essentially provides that when a party proffers expert scientific

---

[3] Federal Rule of Evidence 702 was amended in December 2023, after Mr. Willis's trial.  Fed. R. Evid. 702 (Apr. 24, 2023, eff. Dec. 1, 2023).  The revised version requires a court to determine whether "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702(d).  The intent of the amendment was "to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology."  Fed. R. Evid. 702 advisory committee's notes to 2023 amendments.  "Nothing in the amendment imposes any new, specific procedures.  Rather, the amendment is simply intended to clarify that Rule 104(a)'s requirement applies to expert opinions under Rule 702."  *Id.*

testimony, the trial court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid . . . ." *Lewis v. United States*, 263 A.3d 1049, 1059 (D.C. 2021) (citation modified). "Rule 702 expressly requires the trial court to determine whether an expert reliably applied principles and methods to the case at hand . . . ." *Faltz*, 318 A.3d at 348 (citation modified).

Before trial, Mr. Willis's codefendant, Mr. Winston, moved to exclude the historical cell site report and proposed testimony of the government's expert, Special Agent Shaw.[4]  In Mr. Winston's view, the notice of the expert and accompanying report did not satisfy the requirements of Rule 16 and the methodology in the report was insufficiently reliable to be admitted under *Motorola* and Rule 702.  The thrust of Mr. Winston's argument was that the government's expert would testify to the exact coverage area of the relevant cell towers, which, he alleged, is not possible based solely on historical call records.  In opposition, the government argued that its cell site expert would opine neither on the exact location of the phones at issue nor on the exact coverage areas of the cell towers.  Because Mr. Winston had, in the

---

[4] The government's original expert was FBI Special Agent Lynda Thomas, and she is the subject of Mr. Winston's motion.  The government notified the defendants in June 2022 that Special Agent Shaw would be replacing Special Agent Thomas.  That substitution is not pertinent to Mr. Willis's claims on appeal.

government's view, grounded his motion on an inaccurate presumption about the expert's opinions, his arguments were "essentially moot."

The motions court, ruling from the bench at a status hearing, concluded that the proposed expert testimony and report were based on reliable principles and would be admitted, albeit with certain limitations. The court declined to conduct a hearing under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because it had previously heard testimony by similar experts in approximately a dozen other cases and had found the principles underlying the testimony reliable. The court repeatedly stated that cross-examination was the appropriate tool for meeting the force of the expert testimony. To address Mr. Winston's concerns, the court also indicated that it would instruct the jurors about how to process and weigh expert testimony. The court explained that, in its view, Rule 702's gatekeeping function is designed to allow "more expert evidence in" and the rejection of expert testimony is "the exception rather than the rule." Specifically with respect to Rule 702(d), the motions court stated that "vigorous cross examination, presentation of contrary evidence including [a] contrary witness, [and] careful instruction on the burden of proof are the traditional means" of addressing the issue of reliable application. Accordingly, the court denied Mr. Winston's motion.

*2.    Standard of Review*

We review a decision to admit or exclude expert testimony for abuse of discretion.[5] *Faltz*, 318 A.3d at 347. "In reviewing for abuse of discretion, we must determine whether the decision maker failed to consider a relevant factor, whether the decision maker relied upon an improper factor, and whether the reasons given reasonably support the conclusion." *Bishop v. United States*, 310 A.3d 629, 641 (D.C. 2024) (citation modified). In addition, the trial court must make "an informed choice drawn from a firm factual foundation." *Brooks v. United States*, 993 A.2d 1090, 1093 (D.C. 2010) (citation modified). Although "the concept of exercise of discretion is a review-restraining one," *id.* (citation modified), "there is an important tradeoff for giving the trial court such latitude: that court must take no shortcuts; it must exercise its discretion with reference to [a]ll the necessary criteria." *Ibn-Tamas v. United States*, 407 A.2d 626, 635 (D.C. 1979). Consequently, "the appellate court must not affirm a ruling premised on trial court discretion unless the record clearly manifests either (1) that the trial court has ruled on each essential criterion, or (2) that the trial court, as a matter of law, had but one option." *Id.* (citation modified).

---

[5] As noted above, only Mr. Willis's codefendant, Mr. Winston, challenged the admissibility of Special Agent Shaw's expert testimony. The government, however, has not argued that Mr. Willis failed to preserve this claim, and, at oral argument, it conceded that Mr. Winston's objections served to preserve the issue for both defendants.

### 3. *Discussion*

Mr. Willis contends that the motions court abused its discretion in admitting Special Agent Shaw's testimony under *Motorola* and Federal Rule of Evidence 702. He argues that, while the court understood that Rule 702 is the governing standard, it failed to "actually apply it." In particular, he asserts that the motions court did not properly determine whether Special Agent Shaw's testimony was the product of reliable principles and methods or "whether Agent Shaw 'reliably applied' the methodology to the facts of *this* case, as required by Rule 702(d)." Instead, the court, according to Mr. Willis, "presumed that all CAST agents use the same principles and methods to reach their conclusions" and that their "testimony is always admissible." These "presumption[s]," argues Mr. Willis, are both "factually and legally flawed." Mr. Willis further claims that the motions court relied too heavily on the tools of the adversarial system, like cross-examination, as justification for inquiring no further into the reliability issue. He contends that this was improper because *Daubert* requires the court to make a preliminary assessment of reliability before the jury weighs the evidence. This error, Mr. Willis asserts, was not harmless and requires reversal.

In response, the government argues that the motions court properly identified the data supporting Special Agent Shaw's proposed testimony and the methodology

he employed, finding them both sufficient and reliable, which satisfies Rule 702. The government additionally contends that Special Agent Shaw's testimony was correctly admitted under Rule 702 because the court acted within its discretion when declining to hold a *Daubert* hearing after finding the expert testimony clearly admissible. Historical CSLI analysis qualifies as such evidence, according to the government, because it has been found to be sufficiently reliable, with some limitations, by numerous state and federal courts. Because the court imposed appropriate limitations on Special Agent Shaw's testimony, the government asserts, no further assessment was needed.

As an initial matter, we face some challenges in assessing whether the motions court properly analyzed the admissibility of Special Agent Shaw's testimony. After discussing Mr. Winston's motion to exclude Special Agent Shaw at a status hearing, the motions court did not issue a written order setting forth its bases for admitting the expert testimony. This court is thus left to parse the court's statements at the hearing to determine whether the court conducted a proper *Motorola* analysis.[6] *See,*

---

[6] We do not suggest that written rulings are always required. *Cf. Ibn-Tamas*, 407 A.2d at 636 n.17 ("This is not to suggest that a trial court must articulate reasons, let alone correct reasons, for every evidentiary ruling. In most instances, the appellate court will be able to 'infer the reasoning upon which the trial court made its determination.'" (citation omitted)). They are, however, advisable where, as here, a court must analyze the admissibility of evidence under a multi-factor test, in order

*e.g.*, *District of Columbia v. Facebook, Inc.*, 340 A.3d 1, 11 (D.C. 2025) (describing the difficulties appellate courts face when they are forced to review hearing transcripts as the primary source of a court's *Motorola*/Rule 702 analysis); *Ealey v. Ealey*, 596 A.2d 43, 46 (D.C. 1991) ("A trial judge must make findings of fact and conclusions of law with respect to every material issue that is raised; otherwise meaningful appellate review cannot occur and this court must remand the case or the record."); *cf. Faltz*, 318 A.3d at 348 (explaining that a conclusory statement in an order denying a motion to exclude an expert witness necessitated a remand for further analysis as required under *Motorola*).

To the extent we can glean the court's thinking from the hearing transcript, the court's statements reveal some analysis under *Motorola*—and Mr. Willis conceded at oral argument that the motions court's analysis of Rules 702(a) and (b) was sufficient—but fail to show a sufficient assessment of all the elements of Rule 702.

Rule 702, which we adopted in *Motorola*, requires the court to consider all four of the rule's factors when assessing proposed expert testimony. Fed. R. Evid. 702; *see Motorola*, 147 A.3d at 757-58. Notably absent from the discussion at the

---

to avoid a situation in which "the appellate court cannot tell from the record whether the judge sufficiently addressed each criterion required for the ruling." *Id.*

motions hearing is an analysis of Special Agent Shaw's proposed testimony under Rule 702(d). Rule 702(d), at the time of the hearing, "expressly require[d] the court to determine whether 'the expert has reliably applied the principles and methods to the facts of the case.'" *Motorola*, 147 A.3d at 757 (quoting Fed. R. Evid. 702(d)). While the motions court here clearly understood the standard it was supposed to employ, there is no indication in the record that it determined whether Special Agent Shaw reliably applied the methodology used by CAST agents to the facts of this case. Instead, the court immediately turned to the tools of the adversarial process as the means to make the reliability determination. This was improper. *See Daubert*, 509 U.S. at 592-93 (holding that the trial judge must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue"); *see also Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017) ("The district court's 'gatekeeping function' under *Daubert* ensures that expert evidence is sufficiently relevant and reliable *when it is submitted to the jury*. Rather than ensure the reliability of the evidence on the front end, the district court effectively let the jury make this determination after listening to [appellant's] cross examination of [appellee's] expert."). While "[v]igorous cross-examination" and other features of the adversarial system remain "the traditional and appropriate means of attacking shaky but admissible evidence," *Daubert*, 509 U.S. at 596, it is

the court's duty to make an initial determination about the reliability of the proposed expert's application of the methodology to the facts at issue, *see Motorola*, 147 A.3d at 757.

When questions were raised regarding Special Agent Shaw's application of CAST's methodology in this case, specifically about the reliability of the graphic displays in the draft reports, the motions court did not engage with the content of the draft reports but instead based its views on past experience.[7] When pressed further by Mr. Winston's counsel, the motions court sidestepped a Rule 702(d) analysis and again suggested that cross-examination was the means by which to properly assess the reliability of Special Agent Shaw's work.[8]

The court's approach illustrates the problem the advisory committee was trying to correct with the 2023 amendments to Rule 702(d). When responding to an argument that Special Agent Shaw's report would subvert the limitations placed on his testimony, the court responded:

---

[7] The draft report in existence at that time was authored by Special Agent Shaw's predecessor, Special Agent Thomas. Special Agent Shaw's final report was not available until July 28, 2022, well after the hearing.

[8] When neither party could produce a copy of the draft report to supplement the discussion, the motions court decided to admit Special Agent Shaw's testimony anyway and placed the burden on the defendants to re-raise with the court objections about particular slides in the report.

So isn't that something that's fair for cross examination. For example, the expert—assuming that the expert goes beyond what you think is within his knowledge base, wouldn't that be appropriate for you to simply use cross examination to demonstrate . . . . It just seems to me to fit right in with what we would use as a tool to test the reliability of the princip[le], but also the reliability of its application to the data.

This view is incorrect. It is the court's job to determine up front whether an expert can testify "within the bounds of what can be concluded from a reliable application of the expert's basis and methodology" because "jurors may lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." Fed. R. Evid. 702 advisory committee's notes to 2023 amendments (citation modified). This duty continues throughout the expert's testimony because the court remains in a better position to assess whether the expert has strayed beyond a reasonable application of their methods. *See United States v. Garcia*, 752 F.3d 382, 396 (4th Cir. 2014) (holding that the district court fulfilled its gatekeeping role initially but that it failed to do so "throughout [the expert's] testimony" where it was apparent that the expert was not reliably applying their methodology).

At oral argument, the government contended that the motions court satisfied Rule 702(d) because it prohibited Special Agent Shaw from opining about the phone user's exact location or asserting that phones always connect to the closest cell

tower. The motions court's discussion at the hearing of these so-called "tripwires," according to the government, indicates an understanding of a decade's worth of case law regarding CSLI and shows consideration of the application of Special Agent Shaw's cell site methodology to Mr. Willis's case. We disagree. These limitations do not reveal whether Special Agent Shaw "reliably applied the principles and methods" behind his testimony to the matter at hand. *Faltz*, 318 A.3d at 348; *see* Fed. R. Evid. 702(d). At most, the motions court's understanding of standard limitations on cell site analysis shows a general grasp of CAST agents' methodology and likely testimony. But, as the motions court acknowledged at least implicitly through its discussions with the government, these limitations are standard practice for CSLI experts. A general application is not an adequate substitute for determining whether Special Agent Shaw reliably applied CAST's methodology "to the facts of th[is] case." *Motorola*, 147 A.3d at 757.

Put another way, the motions court understood the "bounds of what can be concluded from a reliable application of [Special Agent Shaw's] basis and methodology." Fed. R. Evid. 702 advisory committee's notes to 2023 amendments. But the record does not show that the court meaningfully assessed whether Special Agent Shaw's proposed testimony and report fell within those "bounds." *See id.* The government is correct that the court made a limited inquiry into the content of Special Agent Shaw's testimony at the hearing. The court's query, however, did not

go beyond obtaining representations from the government about the content of Special Agent Shaw's testimony, which is insufficient. *See Nelson v. United States*, 601 A.2d 582, 590 (D.C. 1991) (holding that courts cannot rely on the "representations of counsel to fill gaps in the record"); *Girardot v. United States*, 996 A.2d 341, 346 (D.C. 2010) ("In conducting its scrutiny of the [expert] proffer, the trial court must take no shortcuts.") (citation modified); *see also United States v. Daniels*, 572 F.2d 535, 540 n.2 (5th Cir. 1978) ("It is questionable whether a trial court should base evidentiary decisions on a prosecutor's unsubstantiated representations."). While "there is no particular procedure that the trial court is required to follow in executing its gatekeeping function under *Daubert*," *Lewis*, 263 A.3d at 1060 (citation modified), courts must materially engage with the proffered expert testimony to satisfy Rule 702(d)'s reliability requirement, *see Motorola*, 147 A.3d at 757.

We find *United States v. Morgan*, 45 F.4th 192 (D.C. Cir. 2022), instructive. There, the appellant argued that the trial court erred when admitting the testimony of the government's expert—another member of CAST—after holding a multi-day *Daubert* hearing. *Id.* at 198. The expert, rather than using historical CSLI, relied on "drive testing technology" to opine on the approximate location of the defendant's and victim's cell phones. *Id.* at 201-02. When evaluating the trial court's examination of whether the expert "reliably applied" his methodology to the case,

the court of appeals identified parts of the trial court's order revealing a proper analysis. *Id.* at 203-04. For example, the trial court checked to see if the expert had assessed whether there had been any changes to the towers or cellular network since the relevant incident before forming his opinions. *Id.* The trial court also scrutinized whether a second CAST agent had peer reviewed the expert's work for potential errors. *Id.* at 204. Satisfied that these details, among others, showed that the trial court had fulfilled its responsibility under Rule 702(d), *id.* at 203, the appellate court concluded that "the [trial] court did not abuse its discretion in finding [the expert's] testimony to be sufficiently reliable[,]" *id.* at 204.

We cannot reach the same conclusion here. Courts need not check particular boxes to satisfy Rule 702(d). *See Motorola*, 147 A.3d at 755 ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999))). They must, however, demonstrate, as the district court in *Morgan* did, that they properly considered whether an expert's "principles and methods are . . . applied reliably to the facts of the case." Fed. R. Evid. 702 advisory committee's notes to 2000 amendments; *see Faltz*, 318 A.3d at 348. The motions court did not demonstrate such consideration here. Absent that, its *Motorola* analysis was incomplete. *See Faltz*, 318 A.3d at 348; *Motorola*, 147 A.3d at 757.

Consequently, the motions court's efforts "fell short of its gatekeeping role in admitting expert testimony under *Motorola*." *See Faltz*, 318 A.3d at 348. The court was "expressly require[d]" to determine whether Special Agent Shaw "reliably applied" CAST's methods to the facts at hand. *Motorola*, 147 A.3d at 757. The motions court's statements at the hearing, however, do not allow us to conclude that this analysis was conducted. When questions were raised in that vein, the motions court was not prepared to discuss the report and placed the onus back on the defendants to raise the issue again. A proper analysis under Rule 702(d) requires more. *Cf., e.g.*, *Murray v. Motorola, Inc.*, 339 A.3d 152, 173-74 (D.C. 2025) ("Judge Irving meticulously reviewed every expert's report to determine if their testimony passed muster. He ultimately found that they did not and articulated reasonable bases for each of those determinations . . . act[ing] well within his discretion."); *Morgan*, 45 F.4th at 198 (explaining how data from the drive test that the CAST agent employed was run through a proprietary program to generate maps and then "independently revie[ed]" by a second agent "to check whether there were any errors"); *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (holding that a Rule 702(d) analysis "requires more than a glance at the expert's credentials; the court must also ensure that the expert has reliably applied the methods in question" (citation omitted)). The failure to properly consider the requirements of Rule 702(d) is an abuse of discretion. *See Bishop*, 310 A.3d at 641; *see also Benn v. United*

*States*, 978 A.2d 1257, 1277 (D.C. 2009) ("Th[e] court must take no shortcuts; it must exercise its discretion with reference to *all* the necessary criteria." (quoting *Ibn-Tamas*, 407 A.2d at 635)).

The next question is whether the court's failure to properly scrutinize the reliability of Special Agent Shaw's application of his proffered methodology to the facts of this case was harmless. *See Smallwood v. United States*, 312 A.3d 219, 227 (D.C. 2024) ("This court will affirm the trial court despite a non-constitutional error if the error was harmless . . . ."). "An error is harmless if we can say, with fair assurance, that the judgment was not substantially swayed by the error." *Faltz*, 318 A.3d at 348 (citation modified). "[T]he central 'issue is whether the record eliminates the appellate court's doubt about whether the error influenced the jury's decision.'" *Smallwood*, 312 A.3d at 227 (quoting *Moghalu v. United States*, 263 A.3d 462, 472 (D.C. 2021)). If an error is found, it is the government's burden to demonstrate that the error was harmless. *See Randolph v. United States*, 882 A.2d 210, 223 (D.C. 2005); *Morales v. United States*, 248 A.3d 161, 182 (D.C. 2021). For nonconstitutional errors, this court has the "authority to find [a] trial court error harmless notwithstanding the government's failure to claim harmlessness." *Randolph*, 882 A.2d at 223. "Nevertheless, this authority must be exercised with restraint." *Id.*

The government's brief includes no argument that the motions court's error in its *Motorola* analysis was harmless, nor any citation to *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946) (articulating the test for nonconstitutional errors), or any other authority concerning harmless error. "The word harm does not appear in its brief, nor does harmful, harmless, or any other permutation or synonym." *Morales*, 248 A.3d at 182. We therefore conclude that the government has forfeited any argument that the motions court's error in its *Motorola*/Rule 702 analysis was harmless. *See Rose v. United States*, 629 A.2d 526, 535 (D.C. 1993) ("It is a basic principle of appellate jurisprudence that points not urged on appeal are deemed to be waived.").

While we have the discretion to find the trial court error harmless notwithstanding the government's forfeiture, we exercise this discretion only when harmlessness is "obvious." *Randolph*, 882 A.2d at 223. Mr. Willis contends that the government repeatedly highlighted Special Agent Shaw's testimony during trial, illustrating the "centrality" of this evidence to the government's case. He also argues that the government presented neither motive evidence nor physical evidence tying him to the shooting, including no fingerprint or DNA evidence connecting him with any physical evidence at the scene of the murders. This resulted, according to Mr. Willis, in an "exceedingly weak" case. The government's case, he claims, relied almost entirely on inferences to be drawn from Mr. Willis's purported calls with

Mr. Schuler and the alleged locations of Mr. Willis's phones on the day of the murders.

Mr. Willis's arguments have at least some force. Because the harmlessness of the motions court's error is therefore "at least debatable," we conclude that the government should not be relieved of its forfeiture. *See id.*

Having concluded that the motions court erred and the error was not harmless, we turn to the appropriate remedy. We begin by noting that D.C. Code § 17-306 allows this court to "affirm, modify, vacate, set aside or reverse any order or judgment . . . lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate order, judgment, or decision, or require such further proceedings to be had, as is just in the circumstances." We further note that in this court Mr. Willis sought "reversal" of his convictions and, while the government argued that the motions court did not err, it did not contend in the alternative that even if the court erred and the error was not harmless, a remedy other than reversal of Mr. Willis's convictions is appropriate, let alone required.

It suffices for present purposes to state that, in the context of Rule 702 or *Motorola/Daubert* error, we at least have the discretion to reverse convictions and remand for further proceedings, including, if the government so chooses, a new trial; we are not required to merely vacate convictions and remand for further analysis of

the admissibility of the expert testimony. *See* D.C. Code § 17-306; *United States v. Bacon*, 979 F.3d 766, 769-70 (9th Cir. 2020) (en banc) (holding, based on 28 U.S.C. § 2106 (the federal analogue to D.C. Code § 17-306), that an appellate court has discretion to reverse a conviction or to remand for an admissibility hearing as the remedy for an inadequate Rule 702 analysis).[9]

To be sure, in other cases we have remanded for the trial court to reconduct a Rule 702 admissibility analysis. *See Facebook*, 340 A.3d at 11-12; *Faltz*, 318 A.3d at 348; *Williams v. United States*, 314 A.3d 1158, 1170 (D.C. 2024). We have not, however, suggested that such remedy is required. Our cases involving a remand for a new admissibility hearing, moreover, involved different circumstances. *Facebook*

---

[9] We say "at least have the discretion" because there is a reasonable argument (albeit not one that we necessarily endorse) that reversal is the only appropriate relief upon a determination of non-harmless Rule 702/*Motorola* error, involving the admission (rather than the exclusion) of testimony, in a direct appeal from a criminal jury conviction. *See Bacon*, 979 F.3d at 769 ("There is considerable force behind both the argument that requiring retrial promotes *Daubert*'s gatekeeping function and the argument that requiring retrial can waste judicial resources and unnecessarily treats *Daubert* errors differently from other evidentiary errors.") (citation modified); *Mukhtar v. Cal. State Univ., Hayward*, 319 F.3d 1073, 1074 (9th Cir. 2003) ("To remand for an evidentiary hearing post-jury verdict undermines *Daubert*'s requirement that *some* reliability determination must be made by the trial court *before* the jury is permitted to hear the evidence. Otherwise, instead of fulfilling its mandatory role as a gatekeeper, the district court clouds its duty to ensure that only reliable evidence is presented with impunity. A post-verdict analysis does not protect the purity of the trial, but instead creates an undue risk of post-hoc rationalization. This is hardly the gatekeeping role the Court envisioned in *Daubert* and its progeny."), *overruled by Bacon*, 979 F.3d at 770.

was a civil case that had not gone to a jury trial; we reversed a grant of summary judgment and remanded for reconsideration of the summary judgment motion under the correct burden of proof for the claim at issue and also for "further analysis and explanation" of the court's exclusion of expert testimony. 340 A.3d at 10-12. *Faltz* was a post-conviction Innocence Protection Act (IPA) case, and, after concluding that the trial court both improperly admitted the government's expert testimony without assessing its reliability under Rule 702 and failed to consider all of the evidence of innocence that the defendant presented, we remanded for reconsideration of the IPA motion, including further analysis of the experts' admissibility. 318 A.3d at 347-50. Neither *Facebook* nor *Faltz* was a direct appeal in a criminal case with a jury trial.

While *Williams* was a direct appeal in a criminal case, we did not conclude that the trial court committed harmful Rule 702/*Motorola* error. 314 A.3d at 1169. Rather, because the trial court had assessed the admissibility of expert testimony under our jurisdiction's old *Dyas*/*Frye* test,[10] and during the pendency of the appeal this court replaced the *Dyas*/*Frye* test with the *Motorola* test, we remanded for analysis under the *Motorola* test. *See id.* at 1169-70; *see also id.* at 1170 ("[T]he

---

[10] *See Dyas v. United States*, 376 A.2d 827 (D.C. 1977); *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

trial judge's decision to admit [the expert's] testimony was based on her analysis under *Dyas/Frye*, the test that governed at the time. She did not have a chance to rule on the admissibility of the testimony under the standard we later adopted in *Motorola*. Therefore, we hold that a remand is necessary in order for the trial judge to apply that test."). Indeed, we cited D.C. Code § 17-306 for the proposition that, in light of the retroactive change in law, a remand was "just in the circumstances." *Id.*[11]

Here, reversal of Mr. Willis's murder convictions, rather than vacatur and remand for a new admissibility hearing, is "just in the circumstances." We cannot say with confidence that the jury trial would not have proceeded differently, with different testimony by Special Agent Shaw and cross-examination by Mr. Willis, had the trial court put the government through its paces under Rule 702(d). With the CSLI evidence constituting such a significant portion of the case against Mr. Willis, reversal of Mr. Willis's murder convictions is the just remedy. The CSLI evidence did not, however, pertain to the charge of fleeing a law enforcement officer, so the *Motorola*/Rule 702 error provides no basis to reverse that conviction.

---

[11] *Benn v. United States*, 978 A.2d 1257 (D.C. 2009), and *Ibn-Tamas v. United States*, 407 A.2d 626 (D.C. 1979), both involved the *exclusion* of defense expert testimony rather than the presentation of expert testimony to a jury without a proper Rule 702 analysis. *Benn*, 978 A.2d at 1273; *Ibn-Tamas*, 407 A.2d at 631, 640.

## B. Juror Disqualification

Mr. Willis's claim that the trial court abused its discretion in declining to disqualify a juror who the defense asserted was sleeping, nodding off, or otherwise inattentive during portions of the trial bears on the validity of Mr. Willis's conviction for fleeing a law enforcement officer. We see no abuse of discretion, however, in the trial court's handling of the matter. *See Lester v. United States*, 25 A.3d 867, 871 (D.C. 2011) ("When a trial court receives a report of a sleeping juror, it has 'considerable discretion' in deciding how to respond." (quoting *Samad v. United States*, 812 A.2d 226, 230 (D.C. 2002))).

If the trial court "notices, or is informed, that a juror is asleep during trial, the court has a responsibility to inquire and to take further action if necessary to rectify the situation." *Golsun v. United States*, 592 A.2d 1054, 1057 (D.C. 1991). "On the basis of its findings the court should then determine whether the juror's conduct had resulted in 'substantial prejudice' to the accused, meaning deprivation 'of the continued, objective, and disinterested judgment of the juror, thereby foreclosing the accused's right to a fair trial.'" *Id.* (quoting *Lee v. United States*, 454 A.2d 770, 773 (D.C. 1982)). If a juror is not "shown nor found to be 'unable or disqualified to perform juror duties,'" "the [trial] court is without legal authority to replace a juror with an alternate during trial." *Hinton v. United States*, 979 A.2d 663, 670 (D.C.

2009) (en banc) (citing Super. Ct. Crim. R. 24(c)); *see Hobbs v. United States*, 18 A.3d 796, 800 (D.C. 2011) ("Once jeopardy attaches and jurors begin their duties, they can no longer be removed for reasons that would meet only the good cause standard.").

The trial court here conducted two separate voir dire sessions with the juror, and, in light of the juror's representations that they were paying attention, concluded that it did not "have the evidence" to support a finding that the juror was unqualified to sit. We decline to substitute our judgment for that of the trial court, given its "familiarity with the proceedings, its observations of the witnesses and lawyers and jurors, and its superior opportunity to get a feel for the case." *Samad*, 812 A.2d at 230 (citation modified).[12]

---

[12] It bears noting, moreover, that with respect to the flight charge, the evidence against Mr. Willis was essentially unrefuted and the question whether Mr. Willis fled or not was straightforward. As to the only remaining conviction, then, we cannot say that any reduced attentiveness by the juror resulted in "substantial prejudice," *Golsun*, 592 A.2d at 1058, to Mr. Willis. *See Johnson v. United States*, 398 A.2d 354, 367 (D.C. 1979) ("[T]he appellate court makes two distinct classes of inquiries when reviewing a trial court's exercise of discretion. It must determine, first, whether the exercise of discretion was in error and, if so, whether the impact of that error requires reversal. It is when both these inquiries are answered in the affirmative that we hold that the trial court 'abused' its discretion.").

## III.   Conclusion

For the foregoing reasons, we reverse Mr. Willis's first-degree murder convictions, affirm Mr. Willis's conviction for fleeing a law enforcement officer, and remand this case for further proceedings.

*So ordered.*